morning call people of the state of Illinois v. Joel Chavez. On behalf of the Avalanche, Mr. Steven Muslin. On behalf of the people, Mr. Matthew J. Schmitt. All right, Mr. Muslin. This is the Court of Counsel. Your Honors, this case arises from a murder charge, which was a bench trial before Judge McAllis. And the main issues in this, in the appeal, whether or not the court erred in denying Mr. Chavez's Sixth Amendment right of confrontation when it denied a motion in limine to bar the autopsy or pathology report from the Cook County Medical Examiner. And then, again, when it allowed that to be put in as substantive evidence to prove the element of the crime of homicide. Prior to, I never said the case name right, but Bolkoming, there was cases in Illinois which said that this was non-testamentary and that autopsy reports could be allowed in. Then Justice Scalia, for the United States Supreme Court, wrote the opinion in Bolkoming and said, no, that you have a Sixth Amendment right to confrontation. And when a element of the crime is being proved and you're not allowed to confront and cross-examine that individual, then you've been deprived that right. What happened in this case was that the state made a conscious choice, and you could tell from the transcript of the trial, they made a conscious choice not to bring in Tara Jones, who was the pathologist. She was in Colorado. She had left Cook County. And although they could have brought her in and the court said that up until, I believe, right before they arrested, they ultimately made that decision on the record, we're not going to bring her in. We're just going to seek to admit this document to prove the element of the crime of homicide to cause a manner of death. Well, they really, I mean, did they actually say that, we're going to just seek to submit that to prove? Or did they say, we are going to have our other experts look at it and comment upon it? Well, they did not have their other experts comment upon it, which is in Leach, which the state cites, the problem was solved. And that's the law. That's the law in civil cases. That's the law in any criminal case. One expert can review another expert's opinion, and he could give an opinion based upon that. But that's not what happened here. None of the other experts gave an opinion as to the cause or manner of death. They talked about the emergency room doctor. He did not say what the cause or manner of death was because the cause of death was in the emergency room. Dr. Karimi was brought in to indicate that injuries such as the child suffered could have been the victim or the victim of abuse. She was an abuse expert. Where did she get the information about the injury suffered? Well, she got it not necessarily, she did not say that she got it from the autopsy report. What she said, if I remember, and I tried the case, is she looked at the hospital records, the x-rays from the hospital, and the emergency records. I don't remember, I quite honestly don't recall, but I don't believe that she got it from the pathology report. And she did not testify to a reasonable degree of medical or scientific certainty what caused the child's death. Neither did any of the other, well, she was the only physician other than the emergency room physician that was put on. Neither testified to that. So the essential element, which is the homicide, the cause and manner of the death, was proven by the admission of the report as a business record. That's how the judge sought to allow it to be admitted. Didn't the minors or the victims' pediatrician testify as well? The pediatrician, I'm sorry, he testified for both the plaintiff and the, I'm sorry, the people and the defendant in this case, but he did not testify as to cause, manner of death. He did not review the autopsy. He testified as to what injuries, what treatment he had with the minor, and the fact that the minor was not ill prior to this day, other than having complaints of a cold, I believe it was the Sunday before this happened, and then he testified that certain injuries could be caused by improper CPR. And that was what Dr. Kalani, who was that individual, testified to. Did anyone actually refer to the autopsy during the trial by the term autopsy other than the trial court? No. No. Isn't the real issue, though, whether or not it's testimonial? The real issue, I believe, is not whether it's testimonial, because under Illinois law, it can clearly be testimonial. The real issue, I believe, is whether or not it's testimonial does not take away from balkaming, which then says, yeah, even if you have the right to cross-examine and to confront anyone. And, you know, that goes on to the, where the courts dealt with the issue, the Supreme Court dealt with the issue of even lab techs in DUI cases. That's how the whole thing started. Well, those are prepared specifically for court, though, right? Those are prepared. And autopsy reports are not, correct? Autopsy reports are not, well, they aren't prepared specifically for courts by, but by custom, they are. I mean, their purpose, theoretically, is not. By custom, in our area, the medical examiner's office acts in an independent fashion, but as an arm of the county. And in this case, they used Cook County as opposed to the medical examiner. I'm not sure why, but that's what it is. The death occurred in Cook County, right? The death occurred in Cook, was that Loyola? Yeah, I'm sorry, the death occurred in Cook County, so it went to Cook County, correct. So are they prepared specifically for, for other purposes? They can be, but in fact, in murder cases or alleged murder cases, they are based, they are prepared for use in part of the murder investigation. And the question with respect, and I think it's two separate things, what you said, I think the issue one is, is yes, is it testimonial? Yes, it can be test, but two, even if it's testimonial, does that trump your Sixth Amendment right to confront? And I don't believe it does, and I don't believe under Balcombe it does. And I believe in this case, the state made a conscious choice not to call the, the person who was available. The state talks about, we've had contact with her, and she can come in, and they would have had to fly her in, and they chose not to spend the money to fly her in, so that was a conscious choice. Isn't Leach right on point though? I don't think Leach is on point, and I'll tell you why. Leach, the reason I think it's not on point is this, there are several things in Leach that did occur similar to what occurred in our case. However, in Leach, there was no motion to eliminate, to bar the report. In Leach, they did not seek to question the admission of the report during the trial. In Leach, the one medical examiner that was not available's report was shown to another So it was a proper opinion that came in, which is, was not the case in, in Chavez. Additionally, in Leach, without a motion to eliminate and without challenging the, until, it was, I believe it wasn't challenged until post-trial or until the appeal, but in Leach, they chose their defense without challenging the admissibility. In our case, our defense was in part based on the fact that the court allowed this to be introduced as a business record. Additionally, when, as we talked about in our reply brief, when you go to the case, and I believe it's called Winship, where they talk about every element has to be proven by competent evidence. And in our situation, this, the death, the cause of death was not proven by competent evidence. And in order to have a homicide, you obviously have to have competent evidence of a homicide, which was missing in this case because it was introduced denying Mr. Chavez his constitutional right of confrontation. Moving to our next, our second issue more quickly is we have Mr., the motion to suppress. Mr. Chavez was in continuous police custody from the 12th till the 15th. And our initial argument is that he was in police custody from the moment he was picked up at the home until, until today. He's been in custody. He never was released from custody. And during those three days, he was in continuous custody, the state's position as well. They didn't have him in a locked room in the police station. He was freed. He wasn't in custody at the hospital. And lastly, that there was a re-initiation at, after he did ask for an attorney, after he'd been in custody for two and a half of the three days. First of all, I believe it's a fiction to say he wasn't in custody. He was, he had a policeman with him at all times from the moment he was, they came to the house for the egg bat call, which they've described as an aggravated battery call, all the way until he ultimately was released. He ultimately was charged. And in fact, you know, the fact that he was, he was not in the lobby of the police station, he wasn't allowed to be in the lobby. He was actually brought up to the second floor, put in a room where there was a policeman outside of that room, albeit working on a computer, but he wasn't, I don't know how a person would believe he was free to leave that situation from the moment that he was picked up until the moment of the reenactment. And although there were Miranda warnings given at different times, I believe that that lengthy of a, of a custodial, of a person being in custody without being allowed to call his family, without having any contact with his family, certainly can wear down an individual's free will. Well, as, as he is, as he requests a ride from the apartment to the hospital, you don't consider that custody, do you? If he requests a ride and then they stop and drop off his child on the way and he's not handcuffed and there's no display of weapons and he's not told that he can't leave. And actually he walks the child up to the door, doesn't he? He did walk the child up to the door. He was placed in the house or left or anything else. I suppose the question is, could he have with a police officer who was known that this was an ad battery call, uh, sitting there and, you know, to say he was free to leave because the officers let him drop his daughter off. Do I believe that if he had attempted to, they would have gone after him? That's not the standard though, is it? That's not the standard. The standard is what would a reasonable man in those circumstances think, right? Do I believe that a reasonable uneducated Hispanic individual placed in the back of a police car thought he was free to leave? I believe the reasonable person would not have to be quite honest with you. Additionally, I don't think he thought he was free to leave when he was taken to an upstairs room in a police station and kept there or whether when he was kept overnight. I don't think at any time he, a reasonable person would believe they were free to leave. I know the only time that he was actually prevented from leaving that room is when he tried to walk to find one of the officers he wanted to talk to. And an officer, my aunt or I don't, I think his name was or something like that. He said, wait, I'll go get him. Right. I didn't put him back in the room, which indicates he wasn't free to just wander either in the police station. Where is that in our timeline? What is that timeline? That is, well, the event happened at nine o'clock. About one o'clock is when they take, he gets to the Aurora police station, I believe. And I think that happened sometime between one and three. I don't know the exact moment, but throughout all there was police with him or he was detained. He didn't, did he, I mean, is it reasonable to, for him to believe that when he asked for a ride, they're going to get it, they're going to go get a limousine? I mean, they, they're all police officers. He knows that, correct? Right. And he also doesn't have a driver's license. Right. Okay. So even if you take that part out of the equation, it's now he's at the hospital. Detectives come. You no longer have just one officer there. You have, I believe, two detectives, one who speaks Spanish and one, and both who are armed and are sitting there with him and start asking questions. But isn't he left alone with the priest and maybe his wife at one point in like a room, although the police officers were probably outside? In a room, but with them keeping an eye on him outside of the room, he's not able to walk out freely because thereafter they're taking him to the police station. They walk him out. Not being handcuffed is, is in my opinion, not something that a reasonable person necessarily believes makes him free to leave because there's two detectives that are walking to the car. Both are armed and they put him in the back of the police car, which is a locked cage. And then they take him. With respect to the re-initiation, the question is, and I know that courts have talked about re-initiation. And the question is, here he asks for his attorney and Ms. Eaton says, you know, okay, I'm going to leave. And then he says, how's my daughter? Is, how's my daughter a re-initiation? I can understand if he said, like in some of the other cases, what's going to happen to me? What's going on? The question of how is my daughter? She could have said fine, not fine, and then just walked out. I thought the phrase that the state is talking about in the sentence is, why does everybody want to blame me for this? I thought that was the statement that the state or something similar to that, that the state is relying. The first statement which she could have left was, and I believe was, give me a second, I think it was, how's my daughter? And at that point in time, there she continues on with questioning. I mean, I think a re-initiation would be, if in fact that was the, that was the first thing he said was, how's my daughter? And then she could have said fine, not fine, whatever, and left. But she began the conversation again, and I don't believe it. In your brief on page 52, and I want to make sure I'm in yours, yes it is, it says here, it goes without saying that Chavez re-initiated contact with the police. However, as our Supreme Court noted, did you say 62? I'm sorry. 52. You then say, here it goes without saying he re-initiated it, but then you argue, what was he really looking for? I mean, so, is. I agree that he spoke first, and obviously that is one of the questions about, but it's what he said is, what I'm saying, what we're arguing, is not a re-initiation. So you're saying when he said that, he didn't, he didn't in fact, in your mind, demonstrate that he knowingly and intelligently waived his rights in the presence of an attorney? Absolutely. I haven't had a chance to talk about the other parts of our brief, but they're, I believe, very well flushed out, and I will then come back and rebuttal. Thank you. You'll have a chance for rebuttal. Thank you. Mr. Schmidt. Good morning, Your Honor, Mr. Counsel. My name is Matthew Schmidt. I'll be representing the people on this matter. There are several issues before the court, but first I would like to apologize for a mistake in my brief. On page 42, I cite several cases standing for the proposition that people can be convicted for first-degree murder for shaken baby syndrome, basically. People v. Armstrong, people v. Rader specifically. People v. Armstrong was actually involuntary manslaughter, and people v. Rader was actually aggravated battery. That was a mistake on my part, and I sincerely apologize. Going to the issues, Justice Fentz, I do agree with your statement that people v. Leach is precisely on point for whether the medical examiner's report comes in. The Illinois Supreme Court was very clear in saying that the medical examiner's reports are non-testimonial pieces of evidence that can be admitted without bringing in the person that prepared them to testify. While in people v. Leach, they did bring in another medical expert to give an opinion based on the autopsy report, but the fact of the matter remains that under a clear holding in Leach, it's not testimonial. We don't have to bring in the expert, and I would disagree with counsel when he says that no one else testified as to the cause of death. Dr. Karimi testified that actually while the precise cause of death is difficult to determine, it was because there were so many potentially fatal injuries, and it's not really a question as to whether or not defendant's conduct caused the death. That was never really any question. Which of the potentially fatal injuries is a question, but the injuries that there is in any question the defendant caused was the cause of death. So I think that issue has been fairly well settled by the trial court. All right. So the cause of death could have been the spleen injury or could have been something that happened within the brain. It could have been the subdural hematoma. It could have been the brain swelling. There were 24 fractures to three different ribs. As you said, there was a grade two laceration of the spleen, which I believe one of the doctors testified they usually only see that severity of injury in a car accident. So there were several severe injuries. I don't believe anyone testified as to which precise injury caused the death. If I recall correctly, the medical examiner's report stated something like cause of death probable of child abuse. All right. Well, did the pediatrician make any reference to the autopsy? No, I don't believe that she ever saw the autopsy. Did the emergency room doctor or was he looking simply or was he testifying about a CT scan? He testified as to the medical reports that he ordered, I believe. And then Dr. Karimi kind of had the overview of all the medical records from the first hospital and the second hospital, but I don't believe that she testified as to the medical examiner's report. Okay. Well, in somebody, and I thought it was Dr. Karimi, testified to arm fractures or arm issues. Yes, Your Honor. Those would not have been ordered at the emergency room, would they? I don't know. I'm not a doctor. I can't speak to that. Well, I don't think the record indicates they were. Okay. The pediatrician never did any x-rays of the child's arms, at least that was noted in the record, correct? I don't believe so, Your Honor. So Dr. Karimi had to be looking at the autopsy report, correct, to find out this information? That seems to be a reasonable inference from the record. What did the judge say about the autopsy? He said something about the pictures or the photos help him to understand the autopsy? Or did he say it the other way around, the autopsy helps him to understand the pictures, but wasn't there some connection that he made with the autopsy report indicating he clearly considered it as part of the evidence in this case? Well, I think it's clear that he considered it as part of the evidence, and I think that he is well within his rights to do so as it is non-testimonial and can be submitted as evidence to be considered with all of the other evidence. Is it properly considered pursuant to Leach a business record or is it some other label? I believe Leach says it is properly admitted under the business record exception as it is created in the common course of business as a medical examiner's office. It is their job to determine cause of death, be it homicide, accident, natural causes. As to the suppression issue, I think that if we follow what defendant considers being in custody, then any time an officer appears for responding to a 911 call, then you're automatically in custody. If, as the defendant says, as soon as the police arrived in response to the defendant's wife's 911 call, they're in custody, I would submit that that is not in custody at all. As they're just there talking, it's a normal part of the investigation. That is not, I'd say there are no weapons drawn. No one had accused him of anything or told him that he was arrested. As Justice Spence pointed out, he asked for a ride and was given a ride and was allowed to leave the car and come back. And one of the factors is the presence or absence of family and friends when you're looking at being in custody. When he was at the hospital, he was taken into a room. There was a translator. There was a hospital priest. At some point, his wife arrives. At one point, there were two officers in the room. One of them didn't say anything. He was just standing there listening. The other one was asking generalized questions. At one point, one of the officers left to have a cigarette, at which point there is nothing on the record to indicate that any police officer was in there or outside of the room. Now, we concede that when he was taken to the police station and placed in the room, he was placed in custody. However, Investigator Easton did properly Mirandize him at the beginning. He initialed the waiver, saying he understood his Miranda rights and was willing to speak to them. Most of his conversation, at least pursuant to the briefs, most of the conversation with Investigator Easton was recorded. Correct, Your Honor. Does the state believe all of it was recorded, or is there some that was not? I believe the testimony indicated that a portion was unrecorded, Investigator Easton coming and saying hello and introducing herself, and then she started the recorder. The trial court below found the defendant's testimony that she threatened him with arrest and denied him his right to counsel. The trial court found that to be not credible. Investigator Easton's testimony would be far more credible. How about the opportunity to make a phone call? Did the trial court specifically talk about that? He says he has to make a phone call. She said, no, you can't make a phone call. At least that's his recollection. Did the court specifically make a reference to that particular sequence? I don't recall if he made a particular reference to that specific question. I know that he did make a finding that he found the defendant's testimony as to that entire encounter, these supposed threats, to be not credible. How was it explained to the defendant that he was there one night and then he was there two nights? What was the explanation for that? I don't recall if it was ever fully explained to him, but we're conceding that at that point he is in custody. When he gets to the Aurora Police Department. When he gets to the Aurora Police Department and he's placed in the room and he's told he can't leave. That's custody. However, each time before he speaks with police or when they go anywhere, as in the reenactment, he is re-given his Miranda rights and continues to speak, making a knowledgeable and voluntary waiver of those rights. The reenactment was of interest. Isn't Easton telling him to throw harder or is she giving him direction as opposed to watching a reenactment as he remembers it? I believe she asked him how hard he threw it and if that's what really happened. I don't recall there being specific directions being given. I think at first he said that he just kind of dropped her on the bed and then he admitted later, well, no, I was four or five feet away. I was over here and I tossed her onto the bed. So I think as this defendant's story kind of changes over the course of time, the investigators grow a little bit more skeptical. Is this what really happened? So now the reenactment is actually videoed and we have audio to it, correct? Correct, yes. And so in viewing that, we wouldn't find her giving him directions? I don't specifically recall that. It's been a long time since I've looked at the record. So even if that is so, we have multiple statements by the defendant saying what he did, changing his story, saying at first, you know, I didn't shake the baby or throw the baby. Well, I shook her a little bit. Well, I threw her two. Well, maybe I shook her and threw her. And I think that speaks to the proving first-degree murder beyond a reasonable doubt. One of the things the case talked about is a changing story indicating knowledge or a guilty mind. So the fact that his story did change goes to evidence of his knowledge at the time that what he did was going to cause, had a likelihood to cause severe bodily injury and or death. Other things that go to that, we previously discussed the nature and severity of the injuries. These were not casual accidental injuries. These were a grade two laceration of the spleen. He usually only sees in car crashes. The breaks in the arm, which one doctor testified that he had never seen before in a nonambulatory baby. Twenty-four rib fractures that Dr. Creamy testified you just don't get from improper chest compressions. So I think when we look at the nature and severity of the injuries, that also speaks to the defendant's knowledge that what he was doing was in fact likely to cause severe bodily harm and or death. And looking again at the size disparity, we've got an 11-pound baby and a 6'1", 204-pound man. That also speaks to knowledge, the great size disparity. You know your actions are going to have, you know, someone could, you know. That also goes to his knowledge because you know that what you're doing is going to have a greater effect on so small a child. Quickly going through the other issues, there is a clerical error in the judgment order. Before you go on to another issue, let me just ask you a question because I think it is an interesting issue. Not so much the reinitiation but whether or not there is an acknowledgement of his Miranda rights or a subsequent waiver of his rights or how in the totality of the circumstances you make a conclusion that there is a waiver. And I realize he's been, by then he's been advised three different times of his Miranda. Once at the first interview, once at the apartment when he does the reenactment and then once for the second interview. And he acknowledges obviously that he has, the defendant knows he has a right to invoke because he did invoke. But considering all of the totality of the circumstances, would you please address the issue of waiver? Sure. Well, I think that there's definitely a reinitiation just to get that off the bat. He does say, I don't know why they're trying to blame me for things that I have nothing to do with, which is not a matter about custodial matters.  But as you said, in the totality of the circumstances, he had been read his rights three times. He did know that he had a right to counsel. Investigator Easton starts gathering her things. You can see it on the video and says, you know, I can't talk to you anymore. And then he makes the statement about, you know, I don't know why they're trying to blame me for things. And then he continues to speak. I mean, if you've been read your rights three times and you've… I think the question was, how do you add all that together to come up with a waiver? Well, by the mere fact that he continued speaking when he knew that he did not have to, he indicated that he understood his rights, that he understood that he had a right to an attorney, the right to remain silent. He chose not to exercise those rights by continuing to speak. First time, the second time, you're talking about down the line. What conduct or action leads you to believe that he waived his Miranda rights the first time? The first time? Well, by continuing to speak. He knew? By continuing to speak with the officers, with the investigators, when he knew. He had the waiver. He was read his rights. He signed the waiver. He indicated at first he didn't understand one. Then she asked him to read it again. He said, okay, I understand. And continued speaking. By continuing to speak, that's a waiver of your right to remain silent. Okay. But doesn't the speech need to relate to the investigation? And what was the investigation at that particular time? Because he doesn't even know his daughter's dead. Correct, Your Honor. She's clearly dead at that point. At the time of the second interview? Yes. Yes. So he's not – he's told it's bad, it's not looking good, there's blood under the lung or there's blood somewhere. And the head's bad. So, you know, he's asking questions about his daughter. And there's a lot of testimony from witnesses who say he loved both of his daughters. He was happy to have both of his daughters. And he was the primary caretaker because I guess Lupe was actually the employed party and she had other obligations. And he didn't have a driver's license. So he's taking care of these girls. So is he talking about his concern for the girls or is he talking about an investigation that he really doesn't even know is ongoing yet? Well, he does ask for after the health of his daughter, but then he does make the statement, but I don't know why they're trying to blame me for things that I have nothing to do with. So obviously he's aware that there is some sort of blame being passed against him, that there is some accusation of wrongdoing against him. I've said as a quote in my brief, it's very similar to the question in the Oregon v. Bradshaw, the U.S. Supreme Court case. Well, what is going to happen to me now? I think this is much more to do with the investigation. He actually says they're trying to blame me for things. You are trying to blame me for things. Obviously indicating that he is aware that something, at least some wrongdoing, if not a charge has been placed against him. Thank you, Your Honor. For any reasons we haven't asked this court to affirm the judgment, the court will. Thank you. Mr. Muslin? First thing I would like to do would be just answer a couple of questions that you asked counsel, and he was unaware of or didn't know the answers. How did Dr. Karimi know about the arm injuries? The reason she knew was there was a scan done at Loyola Hospital, which detected all those, which was separate and apart from the autopsy report. Additionally, she testified, which is what she tested. She did not have any opinions to a reasonable degree of medical or scientific certainty as to how the arm injuries happened, when they happened, how the skull injury happened, when it happened. Each of the things that she talked about, I specifically asked her regarding did she have an opinion, hold an opinion to a medical, reasonable degree of medical and scientific certainty, and she said no. But she did become aware of those injuries because of a scan. Additionally, Judge Michalis found in his written ruling that he could not determine who caused these injuries or when they were caused. So with respect to Mr. Chavez, additionally, with respect to the question of the reenactment, there was tremendous direction given by Investigator Easton and the other officer who was there through Investigator Easton, well, throw the baby harder. It must have hit the wall. Throw it harder so it hits the wall. I mean, they were, this, I do not understand how this was a freely and voluntary reenactment when these directions were constantly given. And obviously, as I saw this, it concerned me because was this what happened or was this what Investigator Easton wanted to display what happened? And she directed Mr. Chavez, who complied with everything she said, to do it in a certain way, which went in as evidence. With respect to the question of whether this should be a first-degree murder case or an involuntary manslaughter case, prior to the opinion which was written by Justice Broussard in the First District, which I forget if the name of the case was Rodriguez or Richardson, these were most of the time cases like Leffler and those which were, or in Armstrong, which were involuntary manslaughter cases. The discussion of the statutes themselves between first-degree murder and involuntary manslaughter, which we have put in the, put in our brief, is very, a person, and we've been, Mr. Chavez has been convicted of two, 959-182, a person who kills an individual without lawful justification commits first-degree murder if in performing the acts which cause the death. He knows that such acts create a strong probability of death, a great bodily harm to that individual or another. Clearly, Judge Bacala said Mr. Chavez had no intentions to cause the death of his minor daughter. That's in his ruling. And then he goes on to say that he must have known that this would cause the death. And there isn't really evidence to show how he must have known. And it's interesting because during the sentencing hearing, Judge Bacala goes, well, it's common sense. Everybody knows. That's what he said. And I don't know that the judge can take it's common sense everyone knows and put that within the evidence which doesn't show everybody knows and then find him guilty of first-degree murder when Section 59-3, which is involuntary manslaughter and reckless homicide, indicates a person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if it's his acts, whether lawful or unlawful, which cause the death are such as are likely to cause death or great bodily harm to some individual and he performs them recklessly. Now, clearly, the testimony here is this child was crying. He was trying to stop the child from crying. And then he was also trying to get the child to breathe when he believed she had stopped breathing. And in doing that, he said he shook the child. And this could happen in less than five seconds. Clearly, this is a reckless act as opposed to an intentional act. And there lies the difference between murder and involuntary manslaughter. And the court found this was not an intentional act. Now, we would ask that, Your Honors, reverse the case and set it for a new trial or in the alternative, reduce the fine. I do have a question. Oh, I'm sorry. I mean, in this case, we have some evidence that the other little girl might have thrown a television remote and then once dropped the kid on its head on the swing. And we also have, you know, and we know that we throw things that are thrown, baseballs. Excuse me. But where, and I think maybe this goes to the common sense issue, where is there any common sense in tossing or throwing a child? Well, the question is that he said, the testimony as to why he threw the child, a soft mattress bed, which I forget was somewhat thick. There was no evidence that the child hit the wall. There was no marks on the wall. There was no evidence of that. He said that he had played with her in the past and that made her happy. And he was trying to stop her from the crying. And he thought if he did that, it would perhaps stop her. And that goes to the question again of the reckless. I mean, was this something intentional or was this a reckless? And also in my argument originally, and I think it's definitely in the transcript, was it talks about did you do something which was below the standard of care? Well, clearly it's below the standard of care for a parent or anyone else to try to stop a child from crying by shaking or tossing onto a bed. But is that an intentional act that results in a murder? Our position is no. Thank you very much for your attention. Thank you, Counsel, for your arguments. The case will be taken under advisement. A decision made in due course. We will stand in recess to get ready for our next case.